## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **ANASTASIA P DIEHL,** | |
| **PLAINTIFF,** | |
| **VS.** | **Case No.: 1:17-cv-00125** |
| **THE MONEY SOURCE INC.; LOANCARE, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; EQUIFAX INFORMATION SERVICES, LLC, and TRANSUNION LLC** | |
| **DEFENDANTS.** | |

---

## AMENDED COMPLAINT

COMES NOW the Plaintiff Anastasia P Diehl (hereafter the "Plaintiff"), by counsel, and as her Complaint against the above-named Defendants, and avers as follows:

### PRELIMINARY STATEMENT

This action arises from the mismanagement and wrongful actions taken in connection with Plaintiff's home mortgage loan. Defendants LoanCare, LLC ("LoanCare"), which claims to be the owner of the loan, and Defendant The Money Source Inc. ("TMS"), which at all times acted as LoanCare's servicing agent, have since October 2015 consistently held Plaintiff in default of her mortgage despite the fact that every mortgage payment has been timely paid through automatice withdrawals. Defendants LoanCare and TMS have engaged in an aggressive collections campaign against Plaintiff which includes harassing phone calls, numerous demands for sums not owed, repeated written express threats of imminent foreclosure, false credit reporting and the unlawful contacts with Plaintiff's ex-husband all in an attempt to coerce Plaintiff to pay sums she does not owe. Defendants LoanCare and TMS have conducted this campaign even

1

though their own records and bank records repeatedly supplied by Plaintiff (at their request) conclusively demonstrate that every mortgage payment owed has been paid through automatic withdrawals from from Plaintiff's bank account.  In addition, TMS failed to comply with the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA") and its implementing regulations which required a reasonable investigation of Plaintiff's Notice of Servicing Error ("NOE") mailed in accordance with Section 2605(d) of RESPA.  TMS failed to conduct such investigation, failed to properly respond to the NOE and failed to take required corrective action. TMS also failed to conduct proper investigation and make corrections to its credit reporting in response to Plaintiff's credit reporting dispute as required by the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681.  Defendants Experian, Equifax and Transunion also failed to conduct any proper investigation of Plaintiff's credit reporting dispute as required under the FCRA. Plaintiff seeks actual and statutory damages, plus attorney's fees and costs, for multiple violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA"), and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. 1681.  Plaintiff also seeks compensatory and punitive damages under Alabama law.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 15 U.S.C. §1681p, 12 U.S.C. § 2617 and 28 U.S.C. 1367.

2.      Venue is proper here because the events giving rise to Plaintiff's cause of action occurred in this district.

## PARTIES

3.      The Plaintiff is a natural person and adult resident of Mobile County, Alabama. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3).

4.      Defendant The Money Source Inc. ("TMS") is a New York corporation doing business in the State of Alabama.   Its principal place of business is located in the state of New York. At all relevant times, TMS acted as an agent for LoanCare with respect to the subject mortgage loan. TMS is a mortgage "servicer" as that term is defined in 12 U.S.C. § 2605(i)(2).

5.      Defendant LoanCare, LLC ("LoanCare") is a Virginia corporation doing business in the State of Alabama.   Its principal place of business is located in the state of Virginia. LoanCare is a mortgage "servicer" as that term is defined in 12 U.S.C. § 2605(i)(2).  At all relevant times, TMS acted as LoanCare's agent with respect to the subject mortgage loan.

6.      Defendant Equifax Information Services, LLC, ("Equifax") is a corporation formed under the laws of the State of Georgia and has its principal place of business in the State of Georgia. Equifax is a consumer reporting agency as defined in § 1681 of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in § 1681a(d) of the FCRA, to third parties.

7.      Defendant Experian Information Solutions, Inc. ("Experian") is a corporation formed under the laws of the State of Ohio and has its principal place of business in the State of Ohio. Experian is a consumer reporting agency as defined in § 1681 of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in § 1681a(d) of the FCRA, to third parties.

8.      Defendant TransUnion, LLC., ("TransUnion")  is a corporation formed under the laws of the State of Delaware and has its principal place of business in the State of Illinois.  Trans

3

Union is a consumer reporting agency as defined in § 1681 of the FCRA, regularly engaged in the business of assembling, evaluating, and dispersing information concerning consumers for the purpose of furnishing consumer reports, as defined in § 1681a(d) of the FCRA, to third parties.

      9.     Defendants Equifax, Experian and Transunion are sometimes referred to herein collectively as "CRA Defendants."

## FACTUAL ALLEGATIONS

### Plaintiff, the LoanCare Mortgage Loan and TMS

      10.    Plaintiff is a 29-year-old Mobile County resident who works as a Registered Nurse in the Neonatal Intensive Care Unit at USA Hospital.  She owns the home located at 9978 Peyton Drive North in Mobile where she lives with her two young children.  This is Plaintiff's first home and she and her family have lived there for several years.

      11.    On or about April 15, 2014, Plaintiff entered into a loan agreement with Home Mortgage of America, Inc. in the amount of $140,409.00.  The loan is secured by a mortgage on Plaintiff's home at 9978 Peyton Drive.

      12.    At all relevant times, Plaintiff has made or tendered timely payments due under the mortgage loan. However, as explained in detail below, those payments have not been recognized or properly applied by Defendants LoanCare and TMS such that the loan has been falsely considered to be in default.  This has led to large amount of added unlawful interest and fees, as well as a unlawful foreclosure action.  All this has caused Plaintiff constant stress and worry over losing her home when, at all times, she has made her payments.

      13.    Shortly after making her first payment, Plaintiff received a letter from LoanCare dated May 28, 2014, thanking her for "choosing The Money Source, Inc. as [her] lender" and explaining that servicing of the loan was being transferred from TMS to LoanCare effective May

4

27, 2014.  The letter also explained that "LoanCare has partnered with [TMS] and will be acting as the subservicer on behalf of [TMS]. . .." The letter instructed Plaintiff to direct all future payments to TMS, "c/o LoanCare."  With the letter, she also received a form for requesting that her payment be auto-drafted from her bnak account.  Plaintiff filled out the attached auto-draft form and returned it to LoanCare as instructed.  For the remainder of 2014, Plaintiff made each of her monthly payments on time through auto-draft as instructed in the letter.

14.     Sometime in late 2014, the Plaintiff received an unsolicited marketing call about LoanCare's "Equity Accelerator Program." The LoanCare agent explained that the program allows her to break her monthly payment into two parts, with the first paid at the beginning and the second paid toward the end of each month.   He explained that by doing so, she would pay off the loan 5-7 years sooner than if she continued to pay the entire amount once per month.  The agent made clear that payment made under the "Equity Accelerator Program" would be applied to her loan each month. There was a $295.00 enrollment fee, plus $2.50 monthly fee; but the agent explained that Plaintiff would save through the accelerator program many times more than the cost of the program.

15.     Relying on these statements, Plaintiff gave her agreement to join the program and pay the fees.  This took place during the marketing call.

16.     Based on LoanCare's representations, she began making payments under the Equity Accelerator Program at or around the beginning of 2015.

17.     In August 2015 Plaintiff received a letter from TMS dated August 8th stating that the servicing of her loan was being transferred from LoanCare to "The Money Source Inc. d/b/a Endeavor America Loan Services" effective August 3, 2015.  As instructed, Plaintiff continued to make payments to TMS through the Equity Accelerator Program.

18.     Prior to the August 2015 servicing transfer notice, the Plaintiff had made all of her

payments due for 2015, by auto-draft and pursuant to LoanCare's "Equity Accelerator Program."
Her monthly mortgage statements confirmed receipt of each monthly payment and listed her loan
as current with no past due amount.

**LoanCare and TMS' Failure to Recognize Payments**

19.    Beginning in October 2015 began receiving monthly mortgage statements showing
a past due amount, even though she continued to make payments through automatic drafts.  The
October statement listed the total amount owed as $2,135.04, including a past due balance of
$1,088.45 and fees and charges of $41.86.

20.    This was incorrect because Plaintiff had made all required payments since the
beginning of the loan and was not in arrears.  In fact, from the beginning of the "loan accelerator
program" the following payments were auto-drafted from Plaintiff's account:

> 1/16/15 - $528.38 payment by EFT to LoanCare
> 1/30/15 - $528.38 payment by EFT to LoanCare
> 2/13/15 - $525.80 payment by EFT to LoanCare
> 2/27/15 - $525.80 payment by EFT to LoanCare
> 3/13/15 - $525.80 payment by EFT to LoanCare
> 3/27/15 - $525.80 payment by EFT to LoanCare
> 4/10/15 - $525.80 payment by EFT to LoanCare
> 4/24/15 - $525.80 payment by EFT to LoanCare
> 5/08/15 - $525.80 payment by EFT to LoanCare
> 5/22/15 - $525.80 payment by EFT to LoanCare
> 6/05/15 - $525.80 payment by EFT to LoanCare
> 6/19/15 - $525.80 payment by EFT to LoanCare
> 7/06/15 - $525.80 payment by EFT to LoanCare
> 7/17/15 - $525.80 payment by EFT to LoanCare
> 8/14/15 - $525.80 payment by EFT to LoanCare
> 8/28/15 - $525.80 payment by EFT to LoanCare
> 9/11/15 - $525.80 payment by EFT to LoanCare
> 9/25/15 - $525.80 payment by EFT to LoanCare

21.    In addition to the false past due amount demanded in the October statement, the
"total fees and charges" were unexplained and are not authorized under the mortgage or note.

22.    Plaintiff continued to make her payments through auto-draft. The next several

6

statements the Plaintiff received from TMS appeared to show her loan current.[1] Even though the unknown fees still appeared on the statements, there was no longer a past due balance.

23.     This changed when Plaintiff received her January 2016 statement which, once again, inexplicably showed her loan in arrears. Like the October 2015 statement, this statement demanded a total due of $2,132.82, which included a past due balance of $1,088.45 and fees and charges of $41.86.

24.     Again, the statement was false and the demanded amounts were not owed.    Since the October 2015 statement, the following payments were auto-drafted from her account:

> 10/09/15 -  $525.80 payment by EFT to LoanCare
> 10/23/15  - $525.80 payment by EFT to LoanCare
> 11/06/15  - $525.80 payment by EFT to LoanCare
> 11/20/15  - $525.80 payment by EFT to LoanCare
> 12/04/15  - $525.80 payment by EFT to LoanCare
> 12/18/15  - $525.80 payment by EFT to LoanCare
> 01/04/16  - $525.80 payment by EFT to LoanCare
> 01/15/16  - $525.80 payment by EFT to LoanCare
> 01/29/16  - $525.80 payment by EFT to LoanCare

25.     Concerned about her account reporting behind, the Plaintiff contacted LoanCare by email in January 2016.  LoanCare did not provide any meaningful response to the email.  Plaintiff then attempt to resolve the issue through phone calls. She called LoanCare in early February 2016 and was placed on hold for an hour and 28 minutes before finally speaking with a representative. She first spoke to Howard (ID No. 6767), and then was transferred to TMS agents Brianna and Kim (ID No. 177262).  She explained to each of these agents that she had made all payments and that the statements showing arrearage was incorrect. The agents told her they would review the account and try to resolve the problem.

26.     The Plaintiff followed up her conversations with a second email to LoanCare's customer service department in February 2016.  In her email, she explained the problem and

---

[1] She received (3) three statements from TMS, dated 10/27/15, 11/4/2015 & 12/11/2015.

attached a copy of her bank statements confirming the withdrawals of her mortgage payments from her bank account.

27.     A few days later, Plaintiff received a past due notice dated February 5, 2016 from TMS stating that the loan is one month past due and demanded payment of $2,132.82. Again this was simply untrue as she had made every payment. In fact, when it sent this letter, TMS had already received bank statements from Plaintiff proving beyond a doubt that mortgage payments had be withdrawn from her account.

28.     Plaintiff received another default letter from TMS, dated February 11, 2016, which falsely stated that her loan was now two months past due. The letter stated that if Plaintiff failed to pay the past due amounts "you could lose your home."

29.     A few days later, Plaintiff received her February 2016 statement which showed a total amount owed as $3,218.96, including a past due amount of $2,174.59 and "fees and charges" of $83.63.

30.     Concerned that the situation was getting worse and that she may lose her home, Plaintiff once again called TMS. This time she spoke to an agent named Kim and soon followed up with another agent named Tina (ID No. 177372) who, it was explained, worked in the "Equity Accelerator Department." Tina informed the Plaintiff that the company had experienced problems properly accounting for other customers' loan payments and were in the process of correcting the problems. Tina assured Plaintiff that those issues would be resolved soon. Plaintiff had similar conversations with other agents who all explained that they would look into it and let her know about a resolution.

31.     TMS continued to send Plaintiff demand letters threatening foreclosure. In its letter dated March 8th, TMS stated that the loan was past due in the amount of $2,172.37 and stated that Plaintiff had failed to respond to its request for payment and failed to communicate with them

regarding the loan.  The letter explained that "[t]he delinquency of your mortgage loan is a very serious matter that could not only jeopardize your credit rating, but ultimately result in the loss of your home. It is imperative that you remit the required payment or contact us as soon as possible so we can determine the best course of action."  Not only did the letter continue TMS' efforts to collect sums not owed; it also chastised Plaintiff for not communicating with TMS when in fact she had many times called in an attempt to resolve the problem and she repeatedly sent TMS bank statements proving that it was wrongfully holding her in arrears.

32.    In April TMS renewed its false claim of arrearage and its threat to foreclose in a letter identical to its March 8th letter.  In that same month, Plaintiff received an "Equity Accelerator Program Activity Statement" which listed every payment withdrawn from Plaintiff's bank account. This confirmed that payments were made for every month since January 2015.  Nevertheless, the April mortgage statement continued to demand a past due balance; this time $2,255.91, plus "fees and charges" of $167.17.  On April 20th, TMS sent another letter to Plaintiff regarding the false arrearage and urging her to contact TMS so that she could explore "an option to avoid foreclosure."

33.    Plaintiff continued to make her monthly mortgage payments through automatic drafts from her bank account.

34.    Frustrated by LoanCare and TMS' refusal to correct its records and increasingly worried that she would lose her home, Plaintiff submitted to TMS a Notice of Servicing Error ("NOE") and Qualified Written Request ("QWR") pursuant to the Real Estate Settlement Procedures Act ("RESPA") about payments not been applied to her loan. She explained that her loan has been falsely held in arrears and she has been threatened with foreclosure. She requested that TMS investigate the matter and make corrections.  Plaintiff's letter also requested specific information and documents, including a loan transaction history and identification of each payment TMS claims was not received.

9

35.    Plaintiff's NOE/QWR was dated May 9, 2016 and mailed by certified mail.  She received a letter from TMS dated May 12th acknowledging receipt and promising a response within thirty (30) days.

36.    In the meantime, TMS' May 2016 statement demanded a total due amount of $4,386.42, which included a past due amount of $3,342.05, plus "fees and charges" of $208.94.

37.    Making matters much worse, TMS sent Plaintiff a letter dated May 17th demanding payment of $3,362.05 and opening the letter with the following statement in all-caps: "YOUR SITUATION IS SERIOUS. YOU COULD LOSE YOUR HOME."  The letter went on to explain that Plaintiff had beached her mortgage and note by "failing to make the monthly payments due 03- 01 - 16 through 05-17- 16."  The letter demanded that Plaintiff pay, by certified funds $3,362.05 to "bring your loan current."  TMS demanded that payment be received within 30 days. The letter stated that "if you do not cure the default(s) on or before the date specified above, the full outstanding balance of your loan [$136,038.26] will be accelerated and become due in full. Unless you can pay the loan off in full, we will refer your loan to a firm in your area that will begin the foreclosure proceedings in accordance with the terms of your mortgage/deed of trust. You could lose your home unless you bring this loan current."

38.    Plaintiff also received a letter from "Equity Accelerator" dated May 25, 2016, which merely provided a document titled "Equity Accelerator's Terms and Conditions."  No explanation was given as to why the document was sent.  The document does not mention Plaintiff's loan and neither her name nor her signature appears anywhere on the document.  In fact, prior to the receipt of this letter, Plaintiff had never seen this document.

39.    Plaintiff continued to make her regular monthly mortgage payments.  She made timely monthly payments each month, but continued receiving statements from TMS stating she was behind.

10

40.     In addition to the false collection letters and statements, TMS and LoanCare also embarked on an aggressive collection call campaign, repeatedly calling Plaintiff on her cell phone while she was at work demanding payment of amounts she did not owe. Plaintiff would repeatedly tell the collectors that she was current and had provided proof f her payments, and she repeatedly asked the collectors to stop calling her. They did not.

41.     By letter dated June 1, 2016, Plaintiff received a check from "Equity Accelerator" for $35.06 purported to be a refund of "program fees" resulting from an enforcement action against "Paymap Inc." The letter explained that the reimbursement was was for "program fees" paid between July 21, 2011 and July 28, 2015. The letter did not mention LoanCare, TMS or Plaintiff's mortgage loan and contained no explanation as to how the $35.06 refund was calculated or why she was receiving the refund.

42.     Plaintiff then received a letter from TMS dated June 6, 2016 which purported to be a response to her  QWR/NOE.  TMS also sent a payment history dated June 5th.  In its June 6th letter, TMS stated as follows:

> In your correspondence you indicate that you use the Equity Accelerator Program to make your monthly mortgage payments. Please be advised that we are not affiliated with that organization. We recommend that you contact them directly if you have any questions or concerns related to their services.
>
> Please note payments received that are less than the full amount; [sic] are placed in suspense in accordance with the TMS partial payment policy. Once sufficient funds to cover a full payment are received TMS applies the full payment. We do accept additional payments towards principal, at any time, without a prepayment penalty. **Our records indicate that you are currently due for the month of March 2016** and want to ensure that you are aware of our numerous payment options.

(Bold added).

43.     In addition to this letter, TMS also provided a "Customer Account Activity Statement" dated June 5th. That document confirms the following:

    a.      That payments were received through the equity accelerator program and

11

applied for January 2015 through December 2015;

b.    That TMS' own records show that Plaintiff was current as of December 2015;

c.    That TMS did not apply or even recognize Plaintiff's electronic payments for January 2016 or April 2016, even though Plaintiff provided evidence of those payments to TMS; and

d.    That Plaintiff was unlawfully charged late fees and property preservation fees.

44.    No other information was provided in response to Plaintiff's NOE/QWR.

45.    Any reasonable investigation of Plaintiff NOE would have included a review of TMS/LoanCare's own pay records and the bank information provided by Plaintiff. Even cursory review would reveal, at a minimum, that Plaintiff was making payments through LoanCare's Equity Accelerator Program and that she had electronically made every payment on time. Any reasonable investigation would have shown that Plaintiff's loan was at all times current and that TMS/LoanCare had failed to apply and/or recognize payments electronically drafted from her account. Such an investigation would also show that Plaintiff was unlawfully charged late fees and other charges related to the false claim of default which should have been immediately refunded. Such an investigation would also show that all of the default letters threatening foreclosure and all of the harassing phone calls were improper and that the collection campaign should immediately cease. Such an investigation would also show that any derogatory reporting to consumer reporting agencies ("CRAs") regarding the mortgage loan was false and should be immediately corrected.

46.    Neither TMS nor LoanCare performed any reasonable investigation or took any corrective actions. To the contrary, they continued to falsely hold Plaintiff in default, continued to report false and derogatory information to the CRAs and continued to threaten to take her family's home.

47.     On June 15, 2016, in response to TMS and LoanCare's continued collections campaign, Plaintiff sent an email to TMS' collections department stating as follows:

> I'm not behind on my payments. My payment were sent to one of ur affiliated companies LoanCare and you need to contact them about the missing payments and bring my account current and you need to remove all fees, stop the harassing phone calls and fix the false reporting to my credit.

48.     On that same day, TMS sent another letter opening with the dire warning (in all caps): "YOUR SITUATION IS SERIOUS. YOU COULD LOSE YOUR HOME." and in its May 17th letter, TMS went on to explain that Plaintiff was in default and that if she failed to pay the past due amount ($3,381.42) by certified funds within 30 days, her loan would be accelerated and referred to a law firm for foreclosure.  TMS repeated its earlier warning: "You could lose your home unless you bring this loan current."

49.     When it mailed its June 15th default letter, TMS knew full well that there was in fact no default and that Plaintiff has made all required payments.  The true status of her loan was known to TMS and easily discernable from even a cursory review of its own records and the bank records Plaintiff had repeatedly provided *at its request*.  At the same time, TMS knew that sending such false and alarming letters which, in no uncertain terms, expresses an intent to foreclose and would cause extreme stress, fear and anguish to Plaintiff.

50.     Increasingly distraught over the relentless threats of foreclosure and collection calls,  Plaintiff kept trying to resolve the situation through phone calls with TMS representatives. Plaintiff had several phone conversations in July and August of 2016.  Other than being told that TMS' system showed that her payments were not applied, Plaintiff was given no explanation as to why TMS continued to hold her in default or whether the problem would be corrected.  In the meantime, Plaintiff continued to receive collection calls, even though she had repeatedly demonstrated that she was not behind.

51.     Around this same time, Plaintiff received another "Equity Accelerator Program Activity Statement," this one dated July 13, 2016, which again confirmed that all of her required mortgage payments had been withdrawn from her bank account since January 2015. The statement was generated by the "LoanCare Servicing Equity Accelerator Processing Center" and also identified the "Equity Accelerator" as "Sponsored by LoanCare Servicing."

52.     On or about August 18th Plaintiff received an email from Kenneth Garcia, a "Collection Supervisor" with TMS.  The email requested that Plaintiff call Mr. Garcia the following day to discuss her loan.  Plaintiff called as instructed and spoke to Mr. Garcia.  Even though he had specifically requested the call, Mr. Garcia seemed to know nothing of the history of the loan or any mistake made by TMS.  He was simply trying to coerce payment from Plaintiff and was unable or unwilling to correct TMS' false information regarding her payments.  The Plaintiff had another conversation with another TMS agent the following day, but again the agent refused to accept Plaintiff's explanation that she had made her payments.

53.     In late August 2016, Plaintiff received a collection letter from National Creditors Connection, Inc. ("NCCI"), a debt collector hired by TMS, which stated that she owed $2,357.50 to TMS and urged her to contact TMS about the debt.

54.     TMS continued its attempt to collect amounts Plaintiff did not owe through an aggressive and harassing collection campaign, including unwelcomed calls to her cell phone, despite her requests to stop calling.  Throughout the remainder of 2016 and into 2017, TMS also continued sending Plaintiff statements demanding past due amounts not owed and continued to send her notices of default which threatened imminent foreclosure of her home.  There is no indication that TMS has made any correction to its false accounting or credit reporting.

55.     TMS' collection efforts continue to this day.  In its latest statement, dated February 18, 2017, TMS claims Plaintiff's loan is due for December 2016 and demands a total amount due

14

of $4,240.95, including a past due amount of $3,174.88 and fees and charges of $41.77.  TMS

also sent another default notice (dated February 14th) which, has its default notices stating "YOUR

SITUATION IS SERIOUS.  YOU COULD LOSE YOUR HOME" and threatening imminent

foreclosure if the false past due amount is not paid.

56.     Frustrated that its collection campaign had not coerced Plaintiff to pay money she

does not owe, TMS resorted to contacting third parties it believed were connected with Plaintiff in

an effort to pressure her to pay these unowed sums.  Sometime in February 2017, TMS contacted

Plaintiff's ex-husband and father of her children about her alleged mortgage delinquency.  TMS

communicated facts to him about her loan, including the claim that she was behind in her

payments.  He does not live in the area and has no connection whatsoever with the mortgage or

the home.  In fact, he and Plaintiff were divorced years before she obtained the subject loan.  To

even locate this person and discover a connection with the Plaintiff would have taken significant

investigatory effort by TMS.  As a result of this contact, Plaintiff was contacted by her ex-husband

expressing concern about her marriage.  Plaintiff has a contentious relationship with her ex-

husband and TMS' wrongful contact with him has caused her extreme stress  and worry that TMS

and LoanCare's failure to recognize her payments could affect matters between her and her ex-

husband, including child custody.

**The Credit Reporting**

57.     In or before February 2016 TMS began reporting to credit bureaus, including the

CRA Defendants, that Plaintiff's mortgage loan was in arrears.  This information was false and

derogatory and  TMS knew at the time that the information was false.

58.     In August 2016, Plaintiff submitted written disputes of the reporting of the

information reported by TMS.  Written disputes were mailed to and received by each of the CRA

Defendants.  In her dispute letter, Plaintiff explained that TMS mortgage account was not past due,

15

that she had made all of her payments and was not behind for any month.   The dispute included a copy of her driver license and bank statements showing conclusive proof that her mortgage payments were deducted from her bank account for each month TMS reported a delinquency. Plaintiff's dispute, including all attachments were mailed directly to all three credit bureaus.

59.     Plaintiff's August letter constitutes a consumer dispute and triggered the requirements set out in 15 U.S.C. § 1681i and 1681s-2(b).

60.     Written responses were provided by Equifax and Trans Union which demonstrated that no corrective action was taken and these Defendants continued to false report the loan in arrears. Experian responded to her dispute by falsely stating that Plaintiff did not provide sufficient identifying information to enable it to conduct an investigation.   Experian wrongfully failed to conduct any proper investigation and continued to falsely report the loan in arrears.

61.     Plaintiff's credit reporting dispute was forwarded to TMS by some or all of the CRA Defendants.   That dispute, together with the information in its own file and the bank information already provided by Plaintiff, provided ample evidence demonstrating that its credit reporting was false. It nevertheless verified the veracity of the reporting to the CRA Defendants, knowing that this would result in continued false information reported on Plaintiff's credit file which would cause her financial harm.   Moreover, TMS continued furnishing the false and derogatory information to credit bureaus, including the CRA Defendants with the knowledge that such information was false or, at a minimum, could not be verified  through any reliable account records.

62.     The information provided by Plaintiff to the CRA Defendants conclusively demonstrate that the information reported by TMS is false and unreliable, and that any reliance on TMS' verification is unreasonable.   TMS did not provide the CRA Defendants with any information or documents refuting the evidence provided by Plaintiff and its response to the CRA

Defendants was limited to an unsubstantiated bare statement that the information reported was correct.

63.     The CRA Defendants failed to perform any reasonable independent investigation of Plaintiff's dispute and the information provided in support of that dispute. CRA Defendants' decision to rely on bare and unsubstantiated statement by TMS, in the face of the information provided by Plaintiff, was unreasonable and constitutes a failure to perform the duties required under the FCRA. CRA Defendants continued reporting the false and derogatory information to the credit bureaus, with the knowledge that such information was false or, at a minimum, had not been verified through any reliable account records.

64.     Plaintiff has suffered damages proximately resulting from the failure by TMS and the CRA Defendants to properly investigate her dispute and cease the false reporting relating to her mortgage loan. This damage includes damage to her credit and reputation, credit denials, loss of credit opportunities and mental anguish.

**COUNT I**
**(VIOLATIONS OF RESPA BY TMS)**

65.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

66.     Section 6(d) of the Real Estate Settlement Procedures Act ("RESPA."), 12 U.S.C. § 2605(e), grants borrowers the right to submit a "Qualified Written Request" ("QWR") to the loan servicer requesting information and documents pertaining to the servicing of his loan. That provision and its implementing regulations also grant borrowers the right to submit a "Notice of Servicing Error" ("NOE"), identifying perceived errors committed by the servicer. 12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.35.

17

67.     A QWR and NOE must sufficiently identify the borrower, the account and the perceived servicing error. Id.

68.     RESPA requires specific actions be taken by the servicer upon receipt of an NOE, including the conducting a reasonable investigation of the error.  The servicer is also required to make all "appropriate corrections" to the account.

69.     Plaintiff's mortgage is a "federally related mortgage loan" within the meaning of 12 U.S.C. § 2602(1).

70.     Defendant TMS is a "servicer" with respect to Plaintiff's loan as that term is defined in 12 U.S.C. § 2605(i)(2).

71.     Plaintiff's May 2016 letters constitutes a QWR and NOE within the meaning of 12 U.S.C. § 2605(e) and its implementing regulations.  TMS was required to reasonably investigate the errors identified in the letter, make all appropriate corrections and provide the information and documents requested.

72.     TMS failed to correct the errors identified in Plaintiff's NOE and continued to report derogatory information to credit bureaus in further violation of 12 U.S.C. § 2605(e).

73.     Plaintiff has suffered actual damages as a proximate result of TMS' failure to comply with Section 2605(e), including mental anguish and emotional distress resulting from TMS' decision, after receiving Plaintiff's NOE, to continue its wrongful attempts to collect money not owed, its wrongful claims of default and its baseless threats of imminent foreclosure. Plaintiff's actual damages also include unlawful fees, interest and other charges incurred as a result of TMS' false claims of default and its failure to correct its error after receipt of the NOE; loss of equity as a result of TMS' failure to correct its failure to apply or recognize payments; damage to Plaintiff's credit and reputation, credit denials and loss of credit opportunities; and payment of

18

costs associated with sending the NOE which, because of TMS' failure to correct its servicing error, were for naught.

74.      TMS has engaged in a pattern and practice of acts and omissions which violate Section 2605(e), including its repeated violations with respect to Plaintiff, sufficient to allow recovery of statutory damages under Section 2605(f).

**WHEREFORE**, Plaintiff requests that this Court enter a judgment against TMS for each violation of RESPA, awarding the following relief:

a.  Statutory and actual damages as provided in 12 U.S.C. § 2605(f);

b.  Reasonable attorney's fees, and costs expended in this proceeding; and

c.  Such other and further relief as the Court may deem just and proper.

## COUNT II
## (BREACH OF THE MORTGAGE AGREEMENT BY LOANCARE AND TMS)

75.      The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

76.      The acts and omissions made by Defendants LoanCare and TMS in connection with management of the Plaintiff's mortgage constitute a breach of the mortgage and note.

77.      Plaintiff has suffered damage as a proximate result of the Defendants breach, including the fear of losing her family's home as a result of Defendants' unlawful claims of default.

78.      The Plaintiff has not breach her mortgage or note and has made all of her payments pursuant to the terms and conditions of her loan.

**WHEREFORE**, the Plaintiff requests that this Court enter a judgment against TMS and LoanCare for breach of the mortgage and award compensatory damages, including damages for mental anguish and emotional distress, plus interest and costs. Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT III
### (FRAUD)

79.     The allegations stated in all of the above paragraphs are incorporated as if fully asserted herein.

80.     LoanCare made several misrepresentations of material fact regarding the Equity Accelerator Program to the Plaintiff, including but not limited to the following:

 a.   That the Equity Accelerator Program would save Plaintiff money by paying down the principal balance sooner than the original amortization schedule;

 b.   That payments made pursuant to the program would be timely applied to Plaintiff's loan so that she would not only be current, but would pay additional amounts which would be applied to her principal balance; and

 c.   That payments made pursuant to the program would be timely submitted to the lender;

81.     The above misrepresentations were made to Plaintiff over the phone during the solicitation call referenced above and were made by a representative or agent of LoanCare. The statements were also reinforced by the written activity statements mailed to Plaintiff as described above.

82.     The above misrepresetations were false when made and both Money Source and LoanCare knew them to be false.  The misrepresentations were made willfully to deceive, or recklessly without knowledge or were made innocently by mistake.  In any case, the misrepresentations were relied upon by the Plaintiff to her detriment.

83.     These misrepresentations were made verbally and in writing as alleged above.

84.     These misrepresentations were part of a pattern and practice of deception and misinformation directed to borrowers to subject them to additional fees that are uncessary.

  **WHEREFORE,** Plaintiff requests that this Court enter judgment against Money Source

and LoanCare for fraud and award Plaintiff compensatory damages, including damages for mental anguish and emotional distress; and punitive damages, plus interest and costs. Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT IV
## (INVASION OF PRIVACY AND WANTON COLLECTIONS)

85.     Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set out herein.

86.     Alabama law imposes upon any creditor and any collector the duty not to take actions to collect a debt which exceed the bounds of reasonableness and/or which wrongfully intrude upon the privacy of the debtor.

87.     The actions taken by the Defendants LoanCare and TMS in falsely holding Plaintiff in default, threatening imminent loss of her home, subjecting Plaintiff to repeated and harassing collection calls and contacting Plaintiff's ex-husband about its false claims that she was behind in her mortgage all constitute an wrongful invasion of Plaintiff's privacy and exceeded the bounds of reasonableness. Those acts also constitute the wanton collection of alleged debt conducted with a wanton or reckless regard for the Plaintiff's welfare.

**WHEREFORE,** Plaintiff requests that this Court enter a judgment against Defendants LoanCare and TMS for invasion of privacy and/or wanton collections and award her compensatory damages, including damages for mental anguish and emotional distress; and punitive damages, plus interest and costs. Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

<u>COUNT V</u>
**(FCRA VIOLATIONS BY EXPERIAN, TRANS UNION AND EQUIFAX)**

88.     Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set out herein.

89.     This count states claims for negligent and willful violations of the Fair Credit Reporting Act ("FCRA") against Defendants Experian, Trans Union and Equfiax (hereinafter named "CRA's")  pursuant to 15 U.S.C. § § 1681o and 1681n.

90.     Defendants Experian, Trans Union and Equfiax are "consumer reporting agencies" as that term is defined in FCRA.

91.     The CRA Defendants have reported false and derogatory credit information on Plaintiff's credit report relating to the above-described mortgage account.  This information was reported to third parties, including Plaintiff's potential lenders and others who may be in a position of evaluating Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation.  This false and derogatory information was, at all relevant times, reported by the CRA's to said third parties by a "consumer report" as that term is defined in the FCRA.

92.     Plaintiff submitted a written consumer dispute to each of the CRA Defendants, explaining  that the information being reported on her credit file relating to the mortgage false and Plaintiff provided documentation supporting her dispute and conclusively demonstrating that the information reported by TMS was false and unreliable.  Based on the information provided in Plaintiff's dispute, any reasonable and independent investigation should have resulted in the removal or the derogatory information.

93.     The CRA Defendants failed in its duty to reasonably investigate Plaintiff's disputes and has merely parroted the false information supplied by TMS, without performing any meaningful or reasonable independent investigation.  As a result, the false and derogatory

information was repeatedly verified and has remained on Plaintiff's credit file. The CRA Defendants also failed to properly respond to the Plaintiff's dispute as required under the FCRA.

94.     CRA Defendants each failed to comply with the requirements of the FCRA in one or more of the following ways:

      a.  By willfully and/or negligently failing, in the preparation of the consumer reports concerning Plaintiff, to follow reasonable procedures to assure maximum possible accuracy of the information it published in its reports relative to Plaintiff;

      b.  By willfully and/or negligently failing to comply with 15 U.S.C. § 1681i, including, but not limited to, the willful and/or negligent failure to conduct any reasonable reinvestigation to determine whether the disputed information was accurate, complete and verifiable;

      c.  By willfully and/or negligently failing to delete information which Experian knew or, had any reasonable investigation been conducted, should have known was inaccurate, incomplete and/or could not be verified;

      d.  By failing to properly respond to Plaintiff's disputes as required by 15 U.S.C. § 1681;

      e.  By failing to exercise due care and reasonable prudence in the preparation of its reports relative to Plaintiff.

95.     As a proximate result of this conduct, Plaintiff suffered actual damages including, but not limited to, the loss of credit, loss of the ability to purchase and benefit from credit; mental and emotional pain, distress, anguish, humiliation, frustration, anxiety and embarrassment.

96.     Each of the CRA Defendants' acts and/or omissions made in violation of the FCRA were willful, entitling Plaintiff to recover the remedies provided in 15 U.S.C. §1681n.

97.     Each of the CRA Defendants' acts and/or omissions made in violation of the FCRA were negligently made, entitling the Plaintiff to recover the remedies provided pursuant to 15 U.S.C. § 1681o.

WHEREFORE, Plaintiff requests that this Court enter a judgment against each of the CRA Defendants for negligent and willful violations of the FCRA and award Plaintiff actual damages, including damages for mental and emotional pain, distress, anguish, humiliation, frustration, anxiety and embarrassment; statutory damages; punitive damages; costs and attorney's fees. Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

## COUNT VI
## (FCRA VIOLATIONS BY THE MONEY SOURCE)

98.     Plaintiff realleges and incorporates each of the preceding paragraphs as if fully set out herein.

99.     This is a claim for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.*

100.     Defendant TMS furnishes credit information to consumer credit reporting agencies as those terms are defined by FCRA.  TMS is subject to requirements of FCRA, including those duties set out in 15 U.S.C. §1681s-2(b).

101.     At all relevant times, TMS provided derogatory and false credit information to consumer reporting agencies ("CRAs"), including the CRA Defendants.  This false and derogatory information furnished by TMS was reported by the CRAs, including the CRA Defendants, to third parties, including Plaintiff's potential lenders and others who may be in a position of evaluating Plaintiff's creditworthiness, credit standing, credit capacity, character and general reputation.

102.     As stated above, Plaintiff notified the CRA Defendants her dispute of the false

24

information being reported by TMS. Upon information and belief, Plaintiff's dispute and all relevant information was forwarded to TMS by each of the CRA Defendants. Nevertheless, the information provided by Plaintiff to the CRA Defendants was also provided to TMS previously by Plaintiff directly.

103.    Information was available to TMS that should have, upon any reasonable investigation, informed TMS that the information it was furnishing to CRAs regarding Plaintiff's mortgage account was false and/or unverifiable.

104.    Despite its knowledge that the information being reported on Plaintiff's credit file was false and/or unverifiable, TMS verified the false and derogatory information as accurate and failed to make any corrections, knowing that by continuing to report the false information, Plaintiff's creditworthiness would be damaged.

105.    TMS has violated the FCRA, specifically 15 U.S.C. §1681s-2(b), in at least the following ways:

  a.    By failing to fully, properly or reasonably investigate Plaintiff's dispute of the reporting of the false and derogatory information;

  b.    By failing to review all relevant information regarding Plaintiff's dispute and/or by disregarding that information after review;

  c.    By, after receiving notice of Plaintiff's dispute, continuing to submit false and derogatory information to the CRAs regarding the alleged debt. TMS knew that information to be false, incomplete and/or not verifiable;

  d.    By failing to modify, delete or permanently block the reporting of credit information regarding Plaintiff which TMS knew to be false, incomplete and/or not verifiable;

  e.    By failing to accurately respond to Plaintiff's disputes made through the CRA

Defendants after receipt of that dispute.

106.   As a proximate result of this conduct, Plaintiff suffered actual damages including, but not limited to, the loss of credit, loss of the ability to purchase and benefit from credit; mental and emotional pain, distress, anguish, humiliation, frustration, anxiety and embarrassment.

107.   TMS' acts and/or omissions made in violation of the FCRA were willful, entitling Plaintiff to recover the remedies provided in 15 U.S.C. §1681n.

108.   TMS' acts and/or omissions made in violation of the FCRA were negligently made, entitling Plaintiff to recover the remedies provided pursuant to 15 U.S.C. § 1681o.

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendant TMS for negligent and willful violations of the FCRA and award Plaintiff actual damages, including damages for mental and emotional pain, distress, anguish, humiliation, frustration, anxiety and embarrassment; statutory damages; punitive damages; costs and attorney's fees. Plaintiff further requests such other relief as the Court deems just and proper, the premises considered.

**TRIAL BY JURY IS HEREBY REQUESTED AS TO ALL CLAIMS AND DEFENSES ASSERTED HEREIN.**

JAMES D. PATTERSON (PATTJ6485)
KENNETH J. RIEMER (RIEMK8712)
UNDERWOOD & RIEMER, P.C.
Attorneys for Plaintiff
166 Government Street, Suite 100
Mobile, Alabama 36602
Telephone: (251) 432-9212
Email: kjr@alalconsumerlaw.com
E-mail: jpatterson@alalaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of the filing to the following:

Kerry P. McInerney
Cheryl H. Oswalt
Sirote & Permutt, P.C.
Post Office Box 55727
Birmingham, AL 35255-5727

John C. Lynch
Troutman Sanders LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462-3038

Amanda McGregor Beckett
3740 Davinci Court, Suite 150
Peachtree Corners, GA 30092

Alexa L. Sendukas
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002

L. Jackson Young, Jr.
FERGUSON FROST, MOORE & YOUNG, LLP
1400 Urban Center Drive, Suite 200
Birmingham, Alabama 35243

Kirkland E. Reid
Jones Walker LLP
11 North Water Street, Suite 1200
Mobile, AL 36602

Archibald T. Reeves, IV
McDowell Knight Roedder & Sledge
Battle House Tower
11 North Water Street, 13th Floor
Mobile, AL 36602

_____
Kenneth J. Riemer