**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **ANASTASIA P. DIEHL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CIVIL ACTION 17-0125-WS-B** |
| | ) |
| **THE MONEY SOURCE, INC.,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

This matter comes before the Court on the Motion for Summary Judgment of Defendant LoanCare, LLC (doc. 86) and the Motion for Summary Judgment of Defendant The Money Source, Inc. (doc. 91). Both Motions have been extensively briefed and are now ripe for disposition.[1]

**I.      Nature of the Case.**

This action arises from a residential mortgage loan transaction gone awry. Plaintiff, Anastasia P. Diehl, contends that defendants LoanCare, LLC ("LoanCare") and The Money

---

[1]      The Court observes that defendants effectively split their briefs into two parts by filing a lengthy "Motion" document (18 pages for LoanCare, 20 pages for The Money Source) consisting almost entirely of a "Narrative Statement of Undisputed Facts," then a separate lengthy "Brief in Support" document (23 pages for LoanCare, 18 pages for The Money Source) consisting solely of legal argument. (*See* docs. 86-87, 91-92.) Shifting the facts portion of a brief into a separate document nominally styled a motion as a means of evading the 30-page limit prescribed by Civil L.R. 7(e) is improper. *See, e.g., Hosea v. Langley*, 2006 WL 314454, *15 n.50 (S.D. Ala. Feb. 8, 2006) ("A party may not circumvent the 30-page briefing limitation set forth in Local Rule 7.1(b) by disaggregating the facts and law portions of its brief into two different filings."); *Phillips v. Irvin*, 2006 WL 1663677, *1 n.3 (S.D. Ala. June 14, 2006) (Local Rules were "not intended to allow parties to evade page limitations … by diverting the fact section of their brief into a separate filing"). The proper procedure is to include both a statement of facts and legal argument in one's brief, and to request leave of court to exceed the 30-page cap if necessary. *See* Civil L.R. 56(a) (movant's summary judgment brief must include all facts relied on, as well as argument supported by legal authority). Notwithstanding the foregoing, in its discretion, the Court will accept defendants' submissions in their present form.

Source, Inc. ("TMS") engaged in malfeasance by, *inter alia*, failing to credit two timely mortgage payments to her account, misleading her as to certain payment options, falsely classifying her loan as being in default, and engaging in an aggressive campaign of harassment to collect mortgage payments that she had already paid.

Diehl's Amended Complaint (doc. 58) sets forth five causes of action against LoanCare and/or TMS.[2] In Count I, Diehl brings a claim against TMS for violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA"), on the theory that "TMS was required to reasonably investigate the errors identified in the letter [from Diehl in May 2016], make all appropriate corrections and provide the information and documents requested." (Doc. 58, ¶ 71.) In Count II, Diehl alleges that LoanCare and TMS breached the mortgage agreement, whereas Diehl has not breached such agreement but has instead timely made all required payments. Count III of the Amended Complaint is a fraud claim directed at both LoanCare and TMS, predicated on allegations that LoanCare made misrepresentations of material fact to Diehl concerning the features, benefits, and operation of the Equity Accelerator Program.[3] As for Count IV, Diehl asserts claims of invasion of privacy against LoanCare and TMS, based on predicate factual allegations that those defendants falsely held her in default, threatened imminent loss of her home, engaged in repeated harassing collection calls, and contacted her ex-husband about their false claims of default. (*Id.*, ¶ 87.) Finally, in Count VI of the Amended Complaint, Diehl brings a claim against TMS for violating the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"), by failing properly to investigate Diehl's dispute of its reporting of false and derogatory credit information; disregarding or failing to review all relevant

---

[2]     Plaintiff also asserts certain causes of action against defendant Trans Union LLC in Count V of the Amended Complaint. The credit reporting agency defendant has filed neither a Rule 56 Motion nor a response to the co-defendants' Motions; therefore, Diehl's claims against Trans Union are beyond the scope of this Order.

[3]     Those alleged misrepresentations are catalogued in the Amended Complaint as follows: "a. That the Equity Accelerator Program would save Plaintiff money by paying down the principal balance sooner than the original amortization schedule; b. That payments made pursuant to the program would be timely applied to Plaintiff's loan so that she would not only be current, but would pay additional amounts which would be applied to her principal balance; and c. That payments made pursuant to the program would be timely submitted to the lender." (Doc. 58, ¶ 80.)

information; submitting credit information that it knew to be false, incomplete or unverifiable; failing to modify or delete reporting of credit information concerning Diehl that it knew to be false, incomplete or unverifiable; and failing to respond accurately to Diehl's disputes through the credit reporting agencies. All five claims are targeted by defendants' summary judgment motions.

## II. Background.[4]

### A. *Diehl's Mortgage Loan and Payment Request.*

On or about April 15, 2014, plaintiff, Anastasia P. Diehl, entered into a promissory note with non-party Home Mortgage of America, Inc., in the amount of $140,409, and secured by a mortgage on Diehl's home, located on Peyton Drive North in Mobile, Alabama. (Doc. 118, Exh. 2.) Before Diehl even made her first payment, defendant TMS acquired the loan. (Cooper Dep. (doc. 118, Exh. 3), at 85.) On May 28, 2014, TMS sent Diehl a letter notifying her as follows:

> "The servicing of your mortgage loan is being transferred from The Money Source, Inc. to LoanCare, on behalf of The Money Source, Inc. effective 05-27-14. LoanCare has partnered with The Money Source, Inc. and will be acting as the subservicer on behalf of The Money Source, Inc. for such things as issuing billing statements, collecting payments, paying your property taxes and homeowners insurance, and preparing year-end statements."

(Cooper Decl. (doc. 123, Exh. A), ¶ 12 & Exh. 4.) In August 2015, the servicing of Diehl's mortgage loan was transferred from defendant LoanCare back to TMS, which continues to service that loan today. (*Id.*, ¶¶ 13, 15.) In a Notice of Servicing Transfer dated July 17, 2015, LoanCare notified Diehl that "LoanCare, LLC will stop accepting payments received from you

---

[4] The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment. … Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted). Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor. Also, federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices."). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

after August 2, 2015.  The Money Source, Inc. will collect your payments going forward." (*Id.*, ¶ 15 & Exh. 5.)  Thus, from August 2015 through the present, TMS has been both the owner and the servicer of Diehl's loan.  (Cooper Dep., at 86.)

In November 2014, Diehl contacted LoanCare to ask if she could make mortgage payments bi-monthly to coincide with her paycheck schedule.  (Diehl Decl. (doc. 118, Exh. 4.), ¶ 2.)  According to Diehl, she "just wanted the convenience of having the mortgage payments automatically withdrawn in conjunction with the direct deposits of [her] paycheck." (*Id.*)  In response, LoanCare sent an email to Diehl stating, "We do offer a variety of payment options including weekly, biweekly, and semi monthly.  Please contact Equity Accelerator Program Enrollment Center directly … for more details."  (Doc. 118, Exh. 6.)  A LoanCare representative has testified that LoanCare actually did <u>not</u> offer a variety of payment options at that time.  (White Dep. (doc. 118, Exh. 7), at 71.)  The email was referring to the Equity Accelerator Program, but made no reference to Paymap, Inc., the entity that administered the program.  (*Id.* at 72.)  At any rate, Diehl contacted the Equity Accelerator Program Enrollment Center through the telephone number furnished by LoanCare.  (Diehl Decl., ¶ 3.)

### B.     The Equity Accelerator Program.

When borrowers like Diehl requested bi-monthly payment arrangements, LoanCare's practice as of November 2014 was to refer them to the Equity Accelerator Program ("EAP").  (Bielby Dep. (doc. 118, Exh. 5), at 70.)  LoanCare would simply provide the borrower with the EAP's information and have them contact the EAP directly.  (*Id.* at 71.)  The EAP is owned by nonparty Paymap, Inc., and is not affiliated with LoanCare.  (Bielby Decl. (doc. 122, Exh. A), ¶ 18.)  Likewise, there is no contractual relationship between TMS and Paymap.  (Cooper Decl., ¶ 17.)  There was, however, a service agreement between LoanCare and Paymap for the EAP during the relevant time period.  (Doc. 118, Exh. 8.)

On December 2, 2014, Diehl received a solicitation email whose sender was listed as "Equity Accelerator Program," with an associated email address of "no-reply@paymap.com". (Doc. 118, Exh. 14.)  The email described the benefits of the "LoanCare Equity Accelerator(R) program" and explained that by enrolling, Diehl could save more than $21,000 in interest payments and pay off her mortgage more than five years early.  (*Id.*)  According to the email, the key features of the EAP were that (i) funds would be electronically debited from her checking or savings account every other Friday, then applied to her mortgage based on her due date each

month; (ii) Diehl would make additional payments of principal applied directly to her balance; and (iii) the EAP was subject to a monthly transaction fee of $5.42 and a one-time enrollment fee of $295, both of which "are small compared to what you can save." (*Id.*) Although nothing in the body of the December 2 email identified the EAP as a product marketed and administered by Paymap, the second page included the following statement: "The Equity Accelerator program is offered by LoanCare under an agreement with Paymap Inc. We provided certain information about you and your mortgage to Paymap so Paymap could assist us in offering the program to you." (*Id.* at 2.) Nothing in that disclaimer specified whether payments, electronic debiting of Diehl's account, or application of those payments to Diehl's loan balance would be handled by LoanCare or Paymap or someone else.

Based on the information provided, Diehl says, her understanding was that LoanCare was offering the EAP, that LoanCare and the EAP were the same entity, and that payments deducted from her account pursuant to the EAP were withdrawn directly by LoanCare for application to her mortgage. (Diehl Decl., ¶ 3.) In reality, however, the way the EAP worked was that Paymap would withdraw funds from the borrower's account, then forward the payment to LoanCare on a monthly basis for application to the borrower's loan balance. (White Dep., at 75.) According to Diehl, had she known that the funds deducted from her account were actually being held by a third party, she would not have enrolled in the EAP, but instead "would have made other arrangements." (Diehl Decl., ¶ 3.) There is no evidence, however, that she ever inquired or sought clarification from LoanCare or the EAP concerning this issue; rather, she simply assumed that LoanCare handled all payments directly.

Diehl enrolled in the EAP, but never signed a written contract with Paymap or anyone else in connection with same. (Diehl Decl., ¶ 13.)[5] Nonetheless, pursuant to her enrollment in

---

[5]     Approximately a year and a half after the fact, Diehl received correspondence from "PAYMAP Equity Accelerator® Customer Service" dated May 25, 2016, and purporting to set forth the "Terms and Conditions" of the EAP. (Doc. 118, Exh. 25.) Defendants make much of their position that this "Terms and Conditions" document is a legally binding contract between Diehl and Paymap, and they point to language therein purporting to bolster that argument. (Doc. 123, Exh. F, at 10 ("This Agreement is a legal document which is binding upon the parties.").) However, the record viewed in the light most favorable to the nonmovant also shows that Diehl first received this document in May 2016, nearly 18 months after enrolling in the program; that she never signed the document; and that Diehl never said or did anything to express assent to it. (Continued)

the program, bimonthly deductions were made from Diehl's account beginning no later than January 2015. (Doc. 118, Exh. 10.) Account activity statements supplied to Diehl reflected that each month, there were two withdrawals from her account, followed by a monthly notation of "Payment sent to your loan servicer" in substantially the full amount of those withdrawals. (*Id.*) The process appeared to work seamlessly during the first half of 2015; indeed, Diehl experienced no issues, and her loan was current as of August 2015. (Bielby Decl., ¶ 17.) Upon being notified that servicing of her loan was transferring from LoanCare to TMS in August 2015, Diehl contacted the EAP telephonically to ensure that her loan payments would be directed to TMS henceforth. (Diehl Decl., ¶ 8.) EAP representatives assured her that, in light of this development, her loan payments would be submitted to TMS going forward. (*Id.*) At no time did TMS, LoanCare or anyone else ever instruct Diehl to refrain from using the EAP as her method of making mortgage payments. (*Id.*)

### C. *The Misapplied Mortgage Payments.*

Despite Diehl's proactive efforts to ensure that her loan payments would be processed properly after the servicing transfer from LoanCare to TMS in August 2015, the EAP persistently forwarded Diehl's payments to LoanCare rather than TMS on at least seven occasions, including August 2015, September 2015, October 2015, November 2015, December 2015, January 2016 and April 2016. (Bielby Decl., ¶¶ 21, 36.) Although most of these misdirected funds eventually reached TMS, for some unspecified reason the January 2016 and April 2016 payments did not. In early 2016, TMS notified Diehl that it had not received her January mortgage payment, even though the EAP had withdrawn those funds from her account in December 2015. (Diehl Decl., ¶ 9.) Similarly, in April 2016, TMS notified Diehl that it had not received her April mortgage payment, even though the EAP had withdrawn those funds from her account in March 2016. (*Id.*, ¶ 10.)[6]

---

For purposes of this summary judgment order, then, the Court does not equate the "Terms and Conditions" document to a written contract between Diehl and Paymap.

[6]     The ultimate whereabouts and disposition of the funds withdrawn from Diehl's account for the January 2016 and April 2016 mortgage payments are not specified in the record. LoanCare claims to have cut a check to Diehl in February 2016 for the missing January 2016 payment that the EAP mistakenly sent to LoanCare instead of to TMS. (Bielby Decl., ¶ 23.) However, Diehl denies ever receiving a refund check from LoanCare, and LoanCare's own (Continued)

Upon becoming aware that her January 2016 and April 2016 payments were never received by TMS, Diehl promptly endeavored to address and resolve the problem, both through telephone contacts and written correspondence. In January 2016, she called and spoke with representatives of both TMS and LoanCare, ultimately spending roughly an hour and a half on the phone with them. (Diehl Dep. (doc. 118, Exh. 1), at 61-64.) A LoanCare representative instructed her to send an email to them so they could investigate what had transpired. (*Id.*) Diehl complied. On February 1, 2016, she sent an email to LoanCare, identifying her name and loan number, attaching bank information confirming her payment history, and explaining the problem as follows: "I'm contacting you in regards to my 1/1/2016 payment that was sent to you electronically from the equity accelerator program. The payment was not applied to my mortgage." (Doc. 118, Exh. 15.)[7] On February 27, 2016, nearly four weeks later, LoanCare sent a response email to Diehl advising her to contact the Equity Accelerator Program directly for further assistance, with the instruction, "If they state that they have sent us your payment, please obtain a proof of payment from them so we may research your request." (Doc. 118, Exh. 16.) Diehl also sent copies of statements to TMS confirming the withdrawal of funds from her account by the EAP for the January 2016 and April 2016 payments, and otherwise furnished TMS with every document requested for proof of the payment deductions from her account. (Diehl Decl., ¶ 11.)[8] Among the documents Diehl sent to TMS was an April 11, 2016 activity

records confirm that no such check was ever cashed. (Diehl Decl., ¶ 12; Bielby Decl., ¶ 24.) For summary judgment purposes, then, the Court views the evidence in the light most favorable to Diehl and assumes that LoanCare never issued a refund to Diehl for the misdirected January 2016 payment. As for the April 2016 payment, LoanCare admits that the EAP improperly routed those funds to it, but says it was unaware of the misdirected funds until well after discovery was underway in this litigation. (Bielby Decl., ¶¶ 25-27, 33.) It is not clear what became of that money in LoanCare's possession.

[7] On the same date, Diehl, the EAP and TMS participated in a three-way telephone call in which the EAP was again instructed to send Diehl's monthly payments to TMS as the current servicer of her loan henceforth. (Cooper Decl., ¶ 24.)

[8] The Court recognizes that TMS's position is that "Ms. Diehl never submitted to TMS the documentation it requested that she provide regarding the missing payments." (Cooper Decl., ¶ 26.) Indeed, TMS's evidence is that it possesses "many, many notes requesting Ms. Diehl to provide us the information from Equity Accelerator to try to kind of research these (Continued)

statement from the EAP, confirming the withdrawals from her account in December 2015 and March 2016, as well as the EAP's representation of "Payment sent to your loan servicer" in the full monthly amount in January 2016 and April 2016. (Diehl Decl., ¶ 11; doc. 118, Exh. 10.)

For its part, TMS continued to deem Diehl's loan in default, despite actual notice of the ongoing discrepancies and disputes over remittance of payments by the EAP to TMS on Diehl's behalf. On February 5, 2016, TMS sent a letter to Diehl advising her that "[y]our mortgage is now one month past due." (Doc. 118, Exh. 17, at 1.) On May 17, 2016, TMS sent a letter to Diehl notifying her that "the captioned loan is in default" because she failed to make payment in April 2016, and that the amount due was $3,362.05. (Doc. 118, Exh. 17, at 25.) To make matters worse, in August 2016, TMS took the funds that Diehl had submitted for that month's mortgage payment, and applied the first $234.82 to late fees, rather than to the principal/interest balance. (Cooper Dep., at 138-39.) In effect, this unilateral action by TMS placed Diehl further in default of her loan, even though TMS was well aware of the problem that the EAP had misdirected Diehl's payments for January 2016 and April 2016.

Not surprisingly, Diehl opted to cancel her enrollment in the EAP. On April 11, 2016, the EAP sent her a letter confirming that her "LoanCare Servicing Equity Accelerator® was closed." (Doc. 118, Exh. 10, at 5.) From that point on, Diehl's mortgage payments have been deducted by TMS directly from her account without incident.

### D. The Collection Activities and Notice of Servicing Error.

Beginning in January 2016, Diehl "received hundreds of collection calls from TMS," including contacts as late as December 14, 2017, the day following her deposition in this action. (Diehl Decl., ¶ 14.)[9] TMS placed many of these collection calls to Diehl using an automated dialing system. (Cooper Dep., at 79-80.) Plaintiff's evidence is that she received collection calls from TMS at various times of day, and on weekends. (Diehl Decl., ¶ 14.) According to Diehl, she never received a collection call from TMS later than 9:00 p.m. (Diehl Dep., at 199.) The

_____

payments," but that Diehl persistently failed to comply. (Cooper Dep., at 164-65 & 167.) For summary judgment purposes, however, Diehl's version of the facts is accepted as true.

[9] This statement does not appear hyperbolic; indeed, a call log produced from TMS's records spans ten pages, with more than 50 calls listed per page, all such calls being directed at Diehl. (Doc. 118, Exh. 18.)

calls would begin respectfully, then the caller would become "aggressive."  (*Id.*)  In addition to using Diehl's cell number (which she had provided to TMS), TMS also placed collection calls to her work telephone number (which she had not provided to TMS).  (Diehl Decl., ¶ 14.)  Diehl never authorized TMS to contact her at work, and she found TMS's efforts to contact her there to be "very embarrassing."  (*Id.*)[10]  Although Diehl asked TMS to stop calling her, the barrage of collection calls continued unabated.  (*Id.*)

From Diehl's perspective, the low point of these collection activities occurred on November 4, 2016, when TMS utilized skip-tracing services to locate a telephone number for her ex-husband.  (Cooper Dep., a 185-86.)  Diehl's ex-husband had nothing to do with the subject mortgage loan and had no obligations under the subject note, yet TMS called him anyway to discuss it, all without Diehl's permission.  (Diehl Decl., ¶ 15.)  The ex-husband then contacted Diehl by text and telephone, accusing her of squandering child support payments and mismanaging her finances, and causing her significant distress.  (*Id.*, ¶ 15 & Exh. 1.)

On May 9, 2016, Diehl sent a letter to TMS bearing the subject line "Qualified Written Request / Notice of Error."  (Doc. 118, Exh. 23.)  In this correspondence, Diehl explained the history of her difficulties with the EAP, including a specific complaint that "several of my payments that were made through the program over the past months have not been applied to my mortgage.  I am NOT behind on my mortgage.  I have reason to believe that you are not properly applying my payments."  (Doc. 118, Exh. 23.)  On that basis, Diehl requested that TMS "investigate all of these matters," "make all appropriate corrections," provide detailed payment and transaction histories, and "regard this as a qualified written request pursuant to 12 U.S.C. 2605(e)."  (*Id.*)  Three days later, on May 12, 2016, TMS sent Diehl a form letter acknowledging her written request for information and advising, "We are working to complete the research you requested on your account and will respond to you within thirty (30) business days of receipt." (Cooper Decl., ¶ 29 & Exh. 8.)

In its written response dated June 6, 2016, TMS advised Diehl that "we are not affiliated with" the EAP, and "recommend[ed] that you contact them directly if you have any questions or

---

[10]      In particular, Diehl testified that on one occasion she was paged to the front desk at her place of employment to take a collection call from TMS.  (Diehl Dep., at 197.)  Diehl was emphatic that she never furnished her work number to TMS.  (*Id.*)

concerns related to their services." (Doc. 118, Exh. 24.)  TMS also summarized Diehl's payment options in that correspondence.  Nowhere in the June 6 letter did TMS explain to Diehl why it had refused to credit payments that it knew she had made through the EAP, from which TMS would accept her payments.  Nor did it offer any corrections or other relief to address Diehl's concerns or to solve her problem, which TMS knew or should have known was occurring through no fault of her own.  And of course, TMS's collections campaign persisted long after this exchange of correspondence and TMS's receipt of information confirming Diehl's withdrawal and payment history through the EAP.

During 2016, TMS reported Diehl's account as delinquent to four credit reporting agencies: Equifax, Transunion, Experian, and Innovis.  (Cooper Decl., ¶¶ 32-42.)  In particular, TMS reported her account as being 30 days' delinquent in April 2016, 60 days' delinquent in August 2016, and 90 days' delinquent in September 2016.  (Hoover Dep. (doc. 118, Exh. 21), at 21.)  In September 2016, Diehl submitted disputes to Experian and other credit bureaus, explaining that she had never been late on payments and that she had sent bank statements to TMS demonstrating that all such payments had been timely withdrawn from her account.  (Doc. 118, Exh. 20.)  TMS continued to report Diehl's loan as delinquent until at least February 2018, based on its failure to receive the January 2016 and April 2016 payments.  (Cooper Decl., ¶ 45.)

### III.  Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-*

*Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.    Analysis.

### A.    *Statutory Claims Against TMS.*

#### 1.    *RESPA Claim (Count I).*

In Count I of the Amended Complaint, Diehl alleges that TMS violated the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA"), by failing to take certain specific actions upon receipt of her Notice of Servicing Error in May 2016.  The Amended Complaint expressly alleges that "TMS was required to reasonably investigate the errors identified in the letter, make all appropriate corrections and provide the information and documents requested." (Doc. 58, ¶ 71.)  This allegation dovetails neatly with the provisions of RESPA, which the Eleventh Circuit has summarized as follows: "Basically, a servicer must respond by fixing the error, crediting the borrower's account, and notifying the borrower; or by concluding that there is no error based on an investigation and then explaining that conclusion in writing to the borrower." *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016) (citations omitted).  Even where a servicer concludes that no error occurred, RESPA mandates that the servicer, among other things, "[c]onduct[] a reasonable investigation." 12 C.F.R. § 1024.35(e)(1)(i); *see also* 12 U.S.C. § 3605(e)(2) (setting forth "investigation" requirement).

TMS seeks entry of summary judgment on Count I for three distinct reasons.  First, TMS maintains that Diehl inadequately pleaded a RESPA cause of action because her Amended Complaint lacked proof that she actually sent a Notice of Servicing Error to TMS, much less that TMS ever received it.  (Doc. 92, at 16.)  That argument is unfounded.  As part of her summary judgment submission, Diehl attached copies of both her May 9 letter and TMS's response dated June 6.  Furthermore, TMS's own evidentiary submission confirms that TMS received the May 9 letter in a timely manner, and responded via letters dated May 12 and June 6.  (Cooper Decl., ¶¶ 28-30.)  Given these undisputed record facts, TMS's insistence that it is entitled to summary judgment on Count I because Diehl has not proven that she actually mailed the May 9 letter to TMS or that TMS ever received it is unavailing.

Second, TMS contends that Diehl's RESPA claim should be dismissed because plaintiff's own evidence demonstrates that TMS timely and fully responded to her May 9 letter. (Doc. 92, at 16-17.) Diehl counters that genuine issues of material fact remain as to whether TMS complied with RESPA's "reasonable investigation" requirement, thereby precluding entry of summary judgment. In so arguing, Diehl reasons that any reasonable investigation by TMS in response to her May 9 letter would have alerted it that (i) TMS allowed the EAP to collect and remit Diehl's mortgage payments; (ii) the EAP withdrew the missing payments from Diehl's account, such that Diehl had actually made all payments; and (iii) corrective action was needed by TMS because Diehl was not actually in default. There being no indication in TMS's evidence that its investigation of the May 9 letter reached any such conclusions, the Court agrees with plaintiff that a jury question remains as to whether TMS performed any reasonable investigation, or whether it simply skipped the investigation step altogether upon learning of the EAP's involvement and unhelpfully passed Diehl's concern off by directing her to contact the EAP instead. *See, e.g., Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 Fed.Appx. 905, 909-10 (11th Cir. Apr. 22, 2016) (plaintiff raised plausible RESPA claim of failure to conduct reasonable investigation where plaintiff repeatedly notified servicer that errors had occurred, but servicer flatly denied any error and engaged in "unreasonable assessments of the situation"); *Finster v. U.S. Bank Nat'l Ass'n*, 245 F. Supp.3d 1304, 1316 (M.D. Fla. 2017) (indicating that RESPA claim predicated on lack of reasonable investigation is actionable where servicer's responses "failed to address the substance of [borrower's] Notices of Error, gave contradictory explanations, or were factually incorrect") (citations omitted). Simply put, Diehl persuasively maintains that TMS's failure to perform a reasonable investigation may be inferred from its unhelpful and largely unresponsive June 6 letter, in which it failed to acknowledge the facts of the situation or the clear evidence that Diehl had timely made all payments to the authorized EAP vendor, such that corrective action on TMS's part was necessary to collect the missing funds held by the EAP and to credit Diehl's account for payments she had actually made. Summary judgment is not warranted on the issue of TMS's compliance with RESPA.[11]

---

[11]     In the face of this argument, TMS makes no showing and presents no evidence that would support (much less require) a finding that it performed a reasonable investigation of the May 9 letter. Instead, TMS attempts to dodge this theory of liability by asserting that "Diehl does not allege in her Amended Complaint that TMS failed to properly investigate," such that (Continued)

Third, TMS moves for summary judgment on Count I on the ground that "Plaintiff failed to properly plead and establish evidence of damage caused by the alleged violations of RESPA by TMS." (Doc. 92, at 17.) This contention overlooks pleadings and evidence to the contrary. To be sure, "[d]amages are 'an essential element' of a RESPA claim." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1011 (11th Cir. 2016) (citation omitted). However, the Amended Complaint contains detailed allegations of actual damages claimed by Diehl under Count I, including (i) "mental anguish and emotional distress resulting from TMS' decision … to continue its wrongful attempts to collect money not owed;" (ii) "unlawful fees, interest and other charges incurred as a result of TMS's false claims of default and its failure to correct its error;" (iii) "loss of equity as a result of TMS' failure to correct its failure to apply or recognize payments;" and (iv) "damage to Plaintiff's credit and reputation." (Doc. 58, ¶ 73.) TMS advances no showing that record evidence is lacking as to any of these types of damages, which have been recognized as supporting cognizable RESPA claims. *See, e.g., Renfroe*, 822 F.3d at 1246-47 (concluding that "[w]hen a plaintiff plausibly alleges that a servicer violated its statutory obligations and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed" for purposes of RESPA's "actual damages" requirement); *Baez v. Specialized Loan Servicing, LLC*, 709 Fed.Appx. 979, 983 n.2 (11th Cir. Sept. 22, 2017) (recognizing that "a plaintiff could establish actual damages [under RESPA] where a servicer

---

"[h]er allegations should be disregarded as untimely." (Doc. 126, at 25.) The general proposition is correct that a party cannot amend her pleadings via a summary judgment memorandum. *See, e.g., Dukes v. Deaton*, 852 F.3d 1035, 1046 (11th Cir. 2017) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (citation omitted). But a fair reading of Count I of the Amended Complaint reveals that Diehl repeatedly referenced the reasonable investigation requirement and alleged that RESPA imposed such a duty on TMS. (Doc. 58, ¶¶ 68, 72.) Under a reasonable reading of Count I as pleaded, the "reasonable investigation" prong is properly in play as a viable RESPA theory here. Moreover, TMS cannot in good faith claim unfair surprise; after all, Diehl's brief narrative statement of facts in the Report of Parties' Planning Meeting filed on June 12, 2017 highlighted her reasonable investigation theory. (Doc. 39, at 2 (setting forth RESPA requirements and stating that "TMS failed to conduct such investigation, failed to properly respond to the NOE and failed to take required corrective action").) In short, the Court finds that Diehl is entitled to pursue Count I on a theory of failure to perform reasonable investigation, and that TMS has made no showing of undisputed fact that it actually did perform such a reasonable investigation in response to Diehl's notice of servicing error dated May 9, 2016.

fails to respond to a notice of error by fixing past errors and issuing refunds of erroneous charges"); *Hernandez v. J.P. Morgan Chase Bank N.A.*, 2016 WL 3982496, *9-10 (S.D. Fla. July 22, 2016) (finding genuine issue of material fact as to RESPA damages where "[i]f a jury were to find that Chase's investigation was insufficient and that there was in fact an error with Plaintiff's account, then Chase would have been obligated under RESPA to refund to Plaintiff the various fees and charges that his account was charged," but "Chase did not do that"). This ground for dismissal of Count I is not meritorious.

For all of the foregoing reasons, TMS's Motion for Summary Judgment is properly **denied** as to plaintiff's RESPA claim set forth in Count I of the Amended Complaint.

## 2. *FCRA Claim (Count VI).*

TMS also moves for summary judgment on Count VI, in which Diehl brings a claim for violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"). The crux of this claim is Diehl's contention that "[i]nformation was available to TMS that should have, upon any reasonable investigation, informed TMS that the information it was furnishing to CRAs regarding Plaintiff's mortgage account was false and/or unverifiable." (Doc. 58, ¶ 103.) Thus, Count VI alleges that TMS violated the FCRA "[b]y failing to fully, properly or reasonably investigate Plaintiff's dispute of the reporting of the false and derogatory information." (*Id.*, ¶ 105(a).) Under the FCRA, when a consumer disputes information with a credit reporting agency, the entity furnishing the information must "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1). The purpose of that investigation is to reach one of three potential ending points: "verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that the information cannot be verified." *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016) (citation and internal quotation marks omitted). The Eleventh Circuit has opined that "'reasonableness' is an appropriate touchstone for evaluating investigations under § 1681s-2(b)." *Id.*

As set forth in her summary judgment response, plaintiff's position in Count VI is that TMS did not satisfy its "reasonable investigation" duty under the FCRA. Indeed, plaintiff argues, the record shows that abundant information available to TMS in September 2016 demonstrated that every penny of the missing payments for Diehl's mortgage account had been timely withdrawn and paid by her through the EAP for remittance to TMS, but that the EAP had failed to submit those funds for January 2016 and April 2016. Had it conducted a proper

investigation, Diehl reasons, TMS would have obtained this information and determined that its reporting to the credit bureaus that Diehl had failed to make such payments was inaccurate or incomplete. Because TMS never made such a determination, plaintiff concludes, a reasonable inference may be drawn that TMS failed to conduct a reasonable investigation under § 1681s-2(b)(1). The Court agrees. On this record, there are genuine issues of material fact as to whether TMS fulfilled its statutory obligation under the FCRA to conduct a reasonable investigation with respect to the disputes that TMS had submitted to credit bureaus concerning Diehl's mortgage loan. Although TMS insists that it performed a timely and reasonable investigation, summary judgment is not warranted on that basis because fact issues remain.

Alternatively, TMS argues, summary judgment is appropriate on Count VI for lack of any showing of conduct justifying an award of damages. In movant's view, "[t]he record is completely silent of any conduct by TMS in its investigation of Plaintiff's credit dispute that could even qualify as negligent, much less reckless or willful," and the FCRA requires a showing of at least negligent violations before damages are available. (Doc. 92, at 20.) It is an accurate statement of law that an entity's FCRA liability to a consumer requires at least negligent violation of the statute. *See* 15 U.S.C. § 1681*o*(1) ("Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of … any actual damages sustained by the consumer as a result of the failure"). However, the summary judgment record supports a reasonable inference that TMS negligently failed to conduct a reasonable investigation. Under Diehl's construction of the evidence, as stated above, a finder of fact could reasonably determine not only that TMS had failed to comply with the reasonable investigation requirements of § 1681s-2(b)(1), but also that such noncompliance was negligent.

For the foregoing reasons, TMS's Motion for Summary Judgment is not well taken as to the FCRA cause of action set forth in Count VI.

### B. *Breach of Mortgage Agreement (Count II).*

Both LoanCare and TMS move for summary judgment on Count II of the Amended Complaint, which alleges breach of the mortgage agreement. As framed in the pleading, Count II states only that "[t]he acts and omissions made by Defendants LoanCare and TMS in connection with management of the Plaintiff's mortgage constitute a breach of the mortgage and note." (Doc. 58, ¶ 76.) In her summary judgment response, however, Diehl concedes that "the

breach of the mortgage claim is not viable as to LoanCare and will be advanced only against TMS." (Doc. 118, at 26.) Accordingly, defendant LoanCare's Motion for Summary Judgment is **granted** as to Count II.

On summary judgment, the principal disagreement between Diehl and TMS is whether TMS breached the promissory note, mortgage, or other loan-related agreements. Diehl identifies two purported breaches by TMS, to-wit: (i) failure to apply the January 2016 and April 2016 mortgage payments to Diehl's account; and (ii) misapplication of Diehl's August 2016 payment to pay itself late fees before principal and interest, thereby placing Diehl's account further in arrearage. The Court will consider each of these circumstances in turn.

First, Diehl maintains that TMS breached the mortgage agreement by not applying the January 2016 and April 2016 payments to her loan balance. As TMS points out, however, undisputed record evidence confirms that the funds withdrawn from Diehl's bank account by Paymap via the EAP program in which Diehl was enrolled were never delivered to TMS. (Cooper Decl., ¶¶ 18, 19, 22.) Simply put, TMS did not receive the payments that Diehl says it was contractually obligated to credit to her loan balance. Plaintiff does not dispute this fact, and offers no evidence that TMS actually came into possession of those January 2016 and April 2016 mortgage payments in a timely manner. Nonetheless, Diehl posits that her payments to the EAP (operated by Paymap) effectively constituted payments to TMS – irrespective of whether TMS actually received them or not – because of the principal/agent relationship between those entities. (Doc. 118, at 21-22, 26.)

There is considerable authority for the proposition that payment to an agent is equivalent to payment to the principal.[12] Thus, the key inquiry is whether there is sufficient record evidence

---

[12]     *See, e.g., Renard v. Turner*, 42 Ala. 117, 119 (1868) (where Tardy was the principal's agent, and Turner was the borrower, "we are satisfied that in this case, the payment to Tardy must be treated as a payment to the principal, so far as Turner is concerned"); *Perez v. First American Title Ins. Co.*, 810 F. Supp.2d 986, 992 (D. Ariz. 2011) ("The Court will adhere to the general principle that payment to an agent constitutes payment to the principal."); *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 579-80 (Bankr. N.D. Cal. 1994) ("It is established that if an agent has authority to receive or collect payment, giving money to that agent is equivalent to payment to the principal himself."); *Metropolitan Ins. and Annuity Co. v. Peachtree Settlement Funding, LLC*, 500 S.W.3d 5, 17 (Tex.App. 2016) ("Under Texas law, payment to an authorized agent of the obligee constitutes payment to the principal.") (citations (Continued)

to support a finding of a principal/agent relationship between TMS and Paymap (the owner of the EAP). "Under Alabama law, the test of agency is the right of control, whether exercised or not. … For one to be an agent, the other party must retain the right to direct the manner in which the business shall be done, as well as the results to be accomplished …." *Franklin v. Mitchell*, 87 So.3d 573, 580-81 (Ala.Civ.App. 2011) (citations omitted); *see also Hollingsworth v. Perry*, 570 U.S. 693, 713, 133 S.Ct. 2652, 186 L.Ed.2d 768 (2013) ("Agency requires more than mere authorization to assert a particular interest. An essential element of agency is the principal's right to control the agent's actions.") (citation and internal quotation marks omitted). Viewing the evidence in the light most favorable to Diehl, the Court finds that the record does not support the existence of a principal/agent relationship here. Uncontroverted evidence establishes that there was no contractual relationship between TMS and Paymap. Nothing in the record would support a reasonable inference that TMS retained any right to control or direct Paymap's actions vis a vis the EAP. And it is undisputed that LoanCare – and not TMS – placed Diehl in contact with Paymap regarding the EAP in the first instance. At most, plaintiff's evidence shows that TMS permitted Paymap to submit borrowers' mortgage payments to it through the vehicle of the EAP. That singular fact, without more, falls well short of establishing the requisite right of control, or any other predicate that might support an inference of an agency relationship. Absent a principal/agent relationship, Diehl's theory that a payment to Paymap equals a payment to TMS for purposes of Count II cannot withstand scrutiny, as plaintiff identifies no other legal principle that might bring about such a result. With no evidence that January and April 2016 payments were ever received by TMS, that defendant's failure to credit those amounts to Diehl's loan balance cannot be a breach of the mortgage agreement.

Second, Diehl contends that TMS breached the mortgage agreement in August 2016 by using "funds deducted from Diehl's account and designated as regular mortgage payment to pay itself late fees," thereby increasing Diehl's arrearage. (Doc. 118, at 27.) As the Court understands it, plaintiff's argument goes like this: In August 2016, Diehl made her regular monthly mortgage payment to TMS in two $526 installments dated August 10 and August 24.

---

and internal marks omitted); *Gordon v. Tobias*, 817 A.2d 683, 689 (Conn. 2003) ("Payment to an agent constitutes payment to the principal.").

However, TMS unilaterally applied the first $234.82 of that payment to late charges on Diehl's purportedly delinquent account. (Cooper Dep., at 138-39.) As a result, Diehl was not credited for making a full payment in August, even though she had done so, and TMS reported her account as being further in arrears because of the late fees it subtracted from what otherwise would have been a full monthly payment of $1,052. (*Id.* at 138-41.) Diehl maintains that TMS's action with respect to allocating the August 2016 payment was in breach of Paragraph 3 of the Mortgage, which specifies as follows:

> "**Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:
> "First, to the mortgage insurance premium to be paid by the Lender …;
> "Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;
> "Third, to interest due under the Note;
> "Fourth, to amortization of the principal of the Note; and
> "Fifth, to late charges due under the Note."

(Doc. 118, Exh. 2, ¶ 3.) In a nutshell, then, Diehl's contention is that TMS breached the Mortgage by applying her August 2016 payment to late charges due under the Note before interest and amortization of principal of the Note, when the clear terms of Paragraph 3 of the Mortgage required payments to be allocated in the opposite order.

In response, TMS does not address the "Application of Payments" provision of the Mortgage. It does not explain why it contends it was entitled to apply Diehl's August 2016 payment first to collect late charges and then to pay down interest and principal, when Paragraph 3 of the Mortgage unequivocally provides the reverse order for application of payments. Instead, TMS simply states that it had the contractual right to charge late fees. (Doc. 126, at 22.) No one is questioning that fact. What is being questioned is why TMS deducted late fees from Diehl's regular monthly mortgage payment in August 2016 before applying said payment to principal and interest, despite clear specification in the mortgage agreement that payments must be applied to principal and interest first. That is the basis of Diehl's breach of contract claim, and it is one for which TMS has presented no satisfactory argument favoring summary judgment.

For these reasons, TMS's Motion for Summary Judgment is **granted in part**, and **denied in part** as to the breach of mortgage agreement claim set forth in Count II of the Amended Complaint. Insofar as Count II is predicated on a theory that TMS breached the agreement by not crediting Diehl's January 2016 and April 2016 payments that it never received, the Motion is **granted** and Count II is **dismissed**. However, insofar as Count II is predicated on a theory that

TMS breached the agreement by misapplying Diehl's August 2016 payment in contravention of the "Application of Payments" provision of the Mortgage, the Motion is **denied** and Count II will proceed to trial on that narrowly circumscribed theory.

### C.     *Fraud (Count III).*

In Count III of the Amended Complaint, Diehl purported to assert a fraud claim against TMS and LoanCare.  As pleaded, Count III focused on allegations that "LoanCare made several misrepresentations of material fact regarding the Equity Accelerator Program" to Diehl, including misrepresentations that the EAP "would save Plaintiff money by paying down the principal balance sooner," that payments via the EAP "would be timely applied to Plaintiff's loan," and that "payments made pursuant to the program would be timely submitted to the lender."  (Doc. 58, ¶ 80.)  No other allegedly fraudulent statements are identified in Count III. Both TMS and LoanCare seek summary judgment on this cause of action.

On summary judgment review, Diehl shifts gears.  By all appearances, she has abandoned the theory espoused in the Amended Complaint that the allegedly fraudulent conduct consisted of statements by LoanCare that the EAP would save her money and that EAP payments would be timely applied to her principal balance and timely submitted to the lender.  Now she indicates that her fraud claim is grounded on a pair of specific misrepresentations by LoanCare that, according to Diehl, concealed Paymap's role in administering the program.  In particular, Diehl points to record evidence that (i) a LoanCare representative informed Diehl via email in November 2014 that "[w]e do offer a variety of payment options including weekly, biweekly and semi monthly;" and (ii) a misrepresentation "[t]hat the EAP was offered by and administered by LoanCare, when in fact it was operated by Paymap."  (Doc. 118, at 28 & Exh. 6.)  As such, Count III stands or falls on the viability of these specific allegations.[13]

It goes without saying that an essential element of any fraud claim is a false representation.  *See, e.g., Deng v. Scroggins*, 169 So.3d 1015, 1024 (Ala. 2014) ("'Fraud' is

---

[13]     As the Court observed, *supra*, a plaintiff generally may not amend her complaint via summary judgment brief.  However, TMS and LoanCare have not objected to Diehl's reframing of Count III on summary judgment.  Instead, defendants chose to litigate this reconfigured, unpleaded iteration of Count III on the merits.  (Doc. 126, at 23-24.)  In light of defendants' failure to oppose this recalibration of plaintiff's fraud claim, the Court accepts the formulation of Count III presented in Diehl's summary judgment response.  (Doc. 118, at 28-30.)

defined as (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation.") (citation omitted); *Alvarez v. United States*, 862 F.3d 1297, 1302 (11th Cir. 2017) ("the essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies") (footnote omitted); *Clarke v. Tannin, Inc.*, --- F. Supp.3d ----, 2018 WL 1322389, *14 (S.D. Ala. Mar. 14, 2018) ("A fraud claim requires a false representation."). Defendants' position is that the "false representation" requirement is not satisfied for either of the statements identified by Diehl as the predicate of Count III.

As noted, the first statement that Diehl contends is a false representation is the November 22, 2014 email from LoanCare customer support, advising Diehl that "[w]e do offer a variety of payment options" for her mortgage. (Doc. 118, Exh. 6.) LoanCare insists that "the above-quoted statement is not false." (Doc. 126, at 23.) But LoanCare witness Donita White testified that LoanCare does not offer a variety of payment options.[14] Nonetheless, there are significant defects with plaintiff's attempts to use the offhand reference to "we" in the November 22 email as the cornerstone of a fraud cause of action. First of all, the term "we" is ambiguous. It could just as easily be referring to LoanCare's arrangement with a third party as it could be referring to LoanCare itself. Second, in the very next sentence of the November 22 email, LoanCare advised Diehl to "[p]lease contact Equity Accelerator Program Enrollment Center directly … for more details." (Doc. 118, Exh. 6.) That sentence suggests a disconnect (or a lack of identity) between LoanCare and the EAP. Third, the record is devoid of facts raising a reasonable inference that Diehl's decision to enroll in the EAP was motivated by her reliance on the November 22 email's

---

[14] The relevant exchange in White's deposition was as follows:

"Q:   What's inconsistent?
"A:   The inconsistent would be that we don't offer a variety of payment options.
"Q:   So this e-mail that someone at Loancare sent to her is not accurate because you don't offer a variety of payment options?
"A:   We do not.
"Q:   What is this referring to? It's referring to the EAP program, right?
"A:   The person who responded to this is referring to the Equity Accelerator program."

(White Dep., at 71.) Although Diehl argues that White admitted the November 22 email was false in this respect (doc. 118, at 28), she actually said no such thing. To the contrary, when asked point-blank, White testified, "It's an accurate e-mail, yes." (White Dep., at 71.)

use of the word "we," much less that it would have been reasonable for her to rely on that statement as a conclusive representation that LoanCare owned and operated the EAP all by itself.[15] Plainly, then, the November 22 email in isolation is not sufficient to vault Count III over the summary judgment hurdle.

In addition to citing the November 22 email, plaintiff asserts that Count III is grounded on "the 'branding' of the EAP under LoanCare's name," which effectively misrepresented to her "[t]hat the EAP was offered by and administered by LoanCare, when in fact it was operated by Paymap." (Doc. 118, at 28.) The trouble with this line of argument is that plaintiff's own exhibits demonstrate that Diehl was repeatedly advised of Paymap's role in the EAP at the outset of her participation in the program, and even earlier. On December 2, 2014, Diehl received a solicitation email from the "Equity Accelerator Enrollment Center." The sender's address of that email was listed as "Equity Accelerator Program <no-reply@paymap.com>." (Doc. 118, Exh. 14.) Thus, Diehl was alerted from the very first line of the exhibit that this solicitation originated from Paymap, not LoanCare. Likewise, the disclaimer at the end of the message included the following notification: "The Equity Accelerator program is offered by LoanCare under an agreement with Paymap Inc. We provided certain information about you and your mortgage to Paymap so Paymap could assist us in offering the program to you." (*Id.*) Identical language was included in correspondence from the EAP to Diehl dated February 2, 2016, shortly after she

---

[15] Of course, reasonable reliance is another essential element of any fraud claim in Alabama. *See, e.g., AstraZeneca LP v. State*, 41 So.3d 15, 27 (Ala. 2009) (under Alabama law, "a party alleging *any form* of fraud must present evidence of 'reasonable reliance' on the purported fraud") (citations omitted). Accepting as truthful Diehl's assertion that she would have "made other arrangements" had she known that a third party was administering the EAP (Diehl Decl., ¶ 3), it would not have been reasonable for her to rely on the ambiguous November 22 email from LoanCare as a definitive pronouncement that LoanCare itself administered the EAP. Although Diehl suggests that reasonable reliance is always a jury question, well-settled law is to the contrary. *See, e.g., Maloof v. John Hancock Life Ins. Co.*, 60 So.3d 263, 271-72 (Ala. 2010) (affirming entry of summary judgment on fraud claim where "the Maloofs could not have reasonably relied on the alleged misrepresentations concerning the availability of benefits from those policies" under the circumstances presented); *Ex parte ERA Marie McConnell Realty, Inc.*, 774 So.2d 588, 591 (Ala. 2000) ("Because the evidence conclusively negates the essential element of reasonable reliance in Platt's fraud claim, the trial court properly entered a summary judgment in favor of the defendants."). Because Diehl could not reasonably have relied on the November 22 email, in and of itself, as a definitive pronouncement that LoanCare and LoanCare alone operated the EAP, that correspondence does not give rise to a viable fraud claim.

enrolled in the program. (Doc. 118, Exh. 9.) These statements unequivocally put Diehl on notice that Paymap was involved in the EAP. Under the circumstances, these record facts cannot support plaintiff's assertion that LoanCare fraudulently misrepresented "[t]hat the EAP was offered by and administered by LoanCare." (Doc. 118, at 28.) The summary judgment record does not support a reasonable inference that LoanCare made any such misrepresentation; moreover, it would have been unreasonable for Diehl to rely on the correspondence she now cites to assume (as she purports to have done) that all facets of administration of the EAP were being handled directly and entirely by LoanCare.[16]

Because the summary judgment record viewed in the light most favorable to Diehl contains neither misrepresentations "that the EAP payments were being handled directly by the servicer" (doc. 118, at 28) nor facts supporting a finding that Diehl could have reasonably relied

---

[16]     It is true, of course, that the subject correspondence does not specifically delineate the respective roles of LoanCare and Paymap in administering the EAP. It does not specify which of those entities is responsible for handling and processing loan payments from the subscriber's account. But that is the point. From the information and correspondence contained in the summary judgment record, Diehl was on notice that an entity called Paymap was directly involved in the EAP. If – as she now says – it was vitally important to Diehl that LoanCare (and not some third party like Paymap) withdraw and process her mortgage payments under the EAP, then she should have requested clarification from the EAP as to what Paymap's role was. She did not do so. Instead, she formed an unfounded belief, based on nothing more than speculation, that notwithstanding the subject correspondence reflecting Paymap's involvement, Paymap actually had nothing to do with the EAP at all and the program was administered exclusively by LoanCare. Such an assumption was unreasonable as a matter of law, on this record. Thus, the Court's conclusion as to Count III is that (i) LoanCare never made misrepresentations to Diehl that LoanCare and only LoanCare administered the EAP and directly handled all financial transactions relating to mortgage payments under that program; and (ii) it was manifestly unreasonable for Diehl to leap to conclusions from the information and correspondence provided to her that LoanCare had such an exclusive administration role with respect to the EAP, which assumptions were in conflict with multiple disclosures made to Diehl prior to and shortly after her enrollment in the program. Simply put, these facts are not the stuff of a cognizable fraud claim under Alabama law. The facial incongruity of Diehl's position is further underscored by undisputed evidence that she remained enrolled in the EAP even after she knew servicing of her loan had been transferred from LoanCare (which she purportedly believed to be administering the EAP) to TMS (which she knew was not). Her decision to remain in the EAP even after she knew her loan was no longer serviced by an entity operating the EAP belies her bald, self-serving statement that she would never have participated in the EAP had she known it was administered by a third party, rather than the servicer of her loan.

on the information provided to make such an assumption, defendants are entitled to summary judgment on Count III in its entirety.

**D.      Invasion of Privacy (Count IV).**

In Count IV of the Amended Complaint, Diehl asserted a state-law claim for invasion of privacy against both LoanCare and TMS.  In pleading this cause of action, plaintiff characterized Alabama law as imposing a duty on creditors and collectors "not to take actions to collect a debt which exceed the bounds of reasonableness and/or which wrongfully intrude upon the privacy of the debtor."  (Doc. 58, ¶ 86.)  As presented in Count IV, Diehl's theory is that LoanCare and TMS breached this duty by "falsely holding Plaintiff in default, threatening imminent loss of her home, subjecting Plaintiff to repeated and harassing collection calls and contacting Plaintiff's ex-husband about its false claims that she was behind in her mortgage."  (*Id.*, ¶ 87.)  The summary judgment record viewed in the light most favorable to plaintiff supports a reasonable inference that TMS engaged in all of the described conduct in the course of its collections efforts against Diehl.[17]  Thus, the question for summary judgment purposes is whether such conduct supports an invasion of privacy / wanton collections claim under Alabama law.

More than three decades ago, the Alabama Supreme Court explained the contours of the tort of invasion of privacy in the collections context, as follows:

> "The tort of invasion of privacy, insofar as it applies to actions of a creditor in regard to his debtor, is the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. … [N]ot every effort by a creditor to collect a debt rises to the level of a lawsuit by the debtor:

> "The mere efforts of a creditor … to collect a debt cannot without more be considered a wrongful and actionable intrusion.  A creditor has and must have the right to take reasonable action to pursue his debtor and collect his debt ….

> "… [S]ome courts have applied a rule of 'reasonableness' in judging the extent to which a creditor may act in pursuing collection and cited cases exemplifying unreasonableness.  Those cases disclose patterns of repeated conduct equating to deliberate harassment, or systematic campaigns designed to vilify the debtor or expose him to public ridicule."

---

[17]      Plaintiff offers no evidence or argument that LoanCare participated in, approved, ratified, benefited from, had any knowledge of, or is in any way legally responsible for TMS's collection efforts on the Diehl loan.  (Doc. 118, at 23-26.)  As such, defendant LoanCare is entitled to summary judgment on Count IV.

*Liberty Loan Corp. of Gadsden v. Mizell*, 410 So.2d 45, 47-48 (Ala. 1982) (citations omitted).[18]

Here, Diehl's evidence is that TMS launched a constant, near-daily barrage of more than 400 collection robocalls to her spanning a nearly two-year period, all despite actual knowledge (and documentary proof) that Diehl had already paid the missing mortgage payments in full but that the EAP had somehow failed to remit them to TMS. Diehl's evidence is also that TMS placed a collection call to her place of employment, resulting in a humiliating incident in which she was called to the front desk to respond; and that TMS even called Diehl's ex-husband about the debt in an effort to ratchet up the pressure on Diehl, inflicting shame and humiliation on her. These facts support a reasonable inference that TMS engaged in a pattern of repeated conduct equating to deliberate harassment, or a systematic campaign designed to vilify Diehl. On this record, genuine issues of material fact plainly exist as to whether TMS's actions to pursue Diehl and collect its debt exceeded the bounds of reasonableness, thereby rising to the level of a wrongful intrusion into her private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. TMS is not entitled to summary judgment on Count IV.[19]

---

[18]     *See also Jacksonville State Bank v. Barnwell*, 481 So.2d 863, 866 (Ala. 1985) (finding liability for invasion of privacy where "the bank far exceeded the bounds of reasonableness in its efforts to collect the Barnwell debt," inasmuch as "[t]wenty-eight to thirty-five phone calls to one's home and place of employment fall within the realm of a 'systematic campaign of harassment,'" bank's agent engaged in "coarse, inflammatory, malicious, and threatening language," and bank fraudulently altered terms of security instrument to attempt to collect debt); *Hart v. General Motors Acceptance Corp.*, 437 So.2d 1255, 1256-57 (Ala. 1983) (explaining that *Liberty Loan* standard was not satisfied "where plaintiff could show only that the creditor made two telephone calls to the person's employer and there was no evidence to show that the creditor's conduct was otherwise unreasonable"); *Hunt v. 21st Mortg. Corp.*, 2014 WL 426275, *8 (N.D. Ala. Feb. 4, 2014) (denying defendant's motion for summary judgment on invasion-of-privacy claim where plaintiff's evidence was that defendant called him more than 100 times, and also called his neighbors and relatives, thereby increasing the chance of causing shame or humiliation to a person of ordinary sensibilities); *Sparks v. Phillips & Cohen Associates, Ltd.*, 641 F. Supp.2d 1234, 1253 (S.D. Ala. 2008) (granting summary judgment on state-law claim for invasion of privacy where collector's activities included calling debtor's unlisted home telephone number on one occasion, having a 96-second conversation with debtor's teenage daughter, mailing a form to the debtor's office, having one heated conversation with the debtor that the debtor initiated, and the like).

[19]     In contending otherwise, TMS floats the argument that Count IV, while characterized in the Amended Complaint as a claim for invasion of privacy, is actually a (Continued)

## V.    Conclusion.

For all of the foregoing reasons, it is **ordered** as follows:

1.    The Motion for Summary Judgment of Defendant LoanCare, LLC (doc. 86) is **granted**, and all claims asserted against LoanCare (including Count II (breach of mortgage agreement), Count III (fraud), and Count IV (invasion of privacy)) are **dismissed with prejudice**;

2.    There being no remaining claims or causes of action pending against defendant LoanCare, LLC, the Clerk of Court is directed to **terminate** that entity as a party defendant to this action;

3.    The Motion for Summary Judgment of Defendant The Money Source, Inc. (doc. 91) is **granted in part, and denied in part**;

4.    The Money Source's Motion for Summary Judgment is **granted** as to the portion of Count II (breach of mortgage agreement) predicated on a theory that TMS breached the agreement by not crediting Diehl's January 2016 and April 2016 payments that it never received; and is also **granted** as to Count III (fraud), and those claims or portions of claims are **dismissed**;

5.    In all other respects, The Money Source's Motion for Summary Judgment is **denied**, including specifically as to Count I (RESPA), the portion of Count II

---

disguised claim for wanton servicing of a mortgage, which is not actionable in Alabama. (Doc. 92, at 14-15; doc. 126, at 21.) This argument fails for at least two independent reasons. First, as plaintiff, Diehl is the master of her complaint. *See, e.g., May v. Sasser*, 666 Fed.Appx. 796, 798 (11th Cir. Nov. 15, 2016) ("The plaintiff is the master of the complaint."). As such, she could have brought a claim against TMS on a theory of wanton mortgage servicing if she wished; however, she did not. She asserted the claim as one for invasion of privacy, which Alabama courts have routinely recognized in the collection context in circumstances akin to those present here. Defendant does not get to transform or recharacterize a plaintiff's cause of action from one theory (that is viable under state law) to another theory (that is not viable under state law) as a matter of wishful thinking or what-ifs. Second, the unpublished district court decision that TMS cites in support of its argument is readily distinguishable in terms of both its facts and its procedural posture. The wanton servicing claim addressed in *Shedd v. Wells Fargo Bank, N.A.*, 2016 WL 3264127 (S.D. Ala. June 13, 2016), bears no resemblance to the invasion of privacy claim found in Count IV of Diehl's Amended Complaint. Unlike Diehl, the plaintiff in *Shedd* never sought to pursue an invasion of privacy claim, but rather (as was her right) framed her claim exclusively in terms of wantonness.

(breach of mortgage agreement) relating to misapplication of the August 2016 payment, Count IV (invasion of privacy), and Count VI (FCRA); and

6.      This action remains set for a Final Pretrial Conference on **July 10, 2018 at 10:00 a.m.**, with trial to follow in the **August 2018** civil term.

DONE and ORDERED this 13th day of June, 2018.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE